All rise. The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning and welcome to the Ninth Circuit. We are glad to be here for our final day of argument for the week. I'm Judge Nelson and I'm pleased to be joined by my colleagues Judge Lee and Judge Rakoff. We're glad to have Judge Rakoff with us from the Southern District of New York where he's sitting with us by designation. We welcome counsel who will be arguing virtually today and in person. During arguments please watch your time, keep to the allocated time frames and try to sum up as time is concluding. Let us know if you want to reserve any time for rebuttal. We're ready to proceed with our oral argument calendar. One case has been submitted, Enrique Palacios v. Garland and we have two cases scheduled for argument this morning, one of which is a consolidated case. The first case set for the Anchorage Hotel 2 v. Unite here, Local 878 and that case is set for 15 minutes per side and we have, do we have Mr. Fischer on? Oh there he is. Okay, Mr. Fischer. Good morning your honor and may it please the court, my name is Gregory Fischer. Here on behalf of the Hilton Anchorage, I'd like to reserve two minutes. I'll do my best to keep an eye on the clock. Before I begin, did the court have any questions for me? Go ahead with your argument. Thank you your honor. This is a jury case. The record is replete with genuine issues of material fact. We all agree that the focus should be on the conduct, not the content of any activity that occurred here. Except for the union's understanding regarding harassment, the core legal principles I don't think are in dispute. The cases that we have been relying upon, principally 520 South Michigan, Ameristar and Point Ruston are entirely consistent with DeBartolo. The union argued below and the district court agreed that we had to prove a level of harassment that was equivalent to violating a criminal statute. The district court specifically wrote in its order, phone calls and messages can be harassing should the act of calling run afoul of state harassment statutes. That's incorrect as a matter of law and grounds for reversal on its own. Quoting Judge Tinder from South Michigan, the correct standard is the employer need not show that the union is criminally or civilly liable for trespass or harassment in order to prevail. The union's con- Counsel can I ask you though, I mean I take your point that harassment and coercion they seem to have a different meaning or be given a different meaning than you might otherwise put them in context, but when you read the cases the Supreme Court is pretty clear that a lot of that hinges on First Amendment principles. So explain to me how we would make a decision here that would go in your favor when you have pretty clear First Amendment protections. How do these not fall within the union's First Amendment protections? Yes, thank you Judge Nelson. You know, I think Judge Shaw in Ameristock really addressed that well and has terrific hypotheticals. The one that I like the most has to do with leafletting. We all agree that handing out handbills, leafletting in the abstract, that's entirely protected. That would never be an occasion to have any sort of issue or complaint with. However, things can go too far. People can be badgering you, impeding your access, doing things that sort of cross that line if you will. So what is the evidence that you induce that that happened here? Well, yes, thank you Judge Rakoff. The evidence that that happened here, assuming that you allow harassment, that concept, can in fact give rise to sufficiently severe coercion to present an actionable claim, the evidence is overwhelming. Give me your best example of harassment. The best example of harassment I can think of is the tertiary conduct that occurred here. It's off the scale. The time and the scope and the level of... What I want is your giving me, maybe with reference to the appendix, the specific non-hearsay evidence that you induced that you say is your best example of harassment. I don't want conclusions. I want evidence. Got it. I understand Judge Rakoff. Thank you. So the union targeted persons with repeated contacts after it was clear that the persons did not want to be contacted. That's evidence of harassing or coercive behavior. I'd like to dig into that a little more because I think you have a point that if you went back to somebody and sent them... A lot of these seem to be emails. I guess there were some letters. As I understand it, the letters were sent to members of the organization, but everybody only received one letter. Is that correct? Yes, Your Honor. There was... So the letters don't rise to this repeated badgering. You'd agree with that? Well, I would posit there's a genuine issue of material fact there too. And here's why. How can... Okay, go ahead. I'm sorry, Judge Rakoff. No, go ahead. I want to hear your explanation. Right. So isn't it troubling that there's this line between rhetorical hyperbole and an outright falsehood? And if you look at the letters, and if you look at the phone script that the union used, and if you look at the emails that they sent, which were the same thing as the letters... Forgive me for interrupting. Are you saying that if a union publishes, puts out a letter or a leaflet that makes, in my hypothetical, a totally false statement, that that is not protected by the First Amendment? Yes. And I'm pointing to Judge Kleinfeld and his dissent in Overstreet. And I'm also pointing, Your Honor, to... Excuse me. How is it... How does the falsity make it coercive in terms of the statute? So number one, the falsity takes it out of the publicity proviso, which is that we expect that communications are going to be protected, but they've got to be truthfully advising members of the public. No, no, no. And we're cautious... I'm sorry. Putting aside defamation, that's a separate issue. I'm just talking about under your claim that this constitutes coercion or harassment or the like. How does the alleged falsity make the statement any more or less coercive? It's one more brick in that wall, Your Honor. It's evincing an intent and a purpose to aggressively harass and intrude upon people. They're not in the problem. How strong is... I mean, assuming we're willing to accept that, and perhaps I'm a little more amenable to that than Judge Rakoff appears to be. That's true. But having said that, what's false here? I mean, you had a separate defamation claim. I read the statements as I was going through your brief, and they were saying things about how there was mold and other things found at the hotel. And I thought, wow, that does strike me as pretty egregious. But then there was no defamation claim brought to that. And I'm led with the conclusion that it might not have been as false as you're suggesting. Right. Well, thank you, Judge Nelson. I think there's a mix of false and sort of misleading communications. To Judge Rakoff's point, I would concede that the misleading communications that kind of blur that line, those are protected. And Judge Kleinfeld had addressed that before, also in San Antonio Community Hospital. The concept of rhetorical hyperbole, that's protected. However, if they're saying something that's an outright falsehood, that's not protected.  The one that I really think is the most critical is the whole concept about whistleblower protection and the idea that Hilton Anchorage terminated an employee for reporting mold. That's an outright falsehood. And the union knew that. What actually happened is that- But you're saying that the falsity is the termination, not that there wasn't mold there. Well, what happened was, it's worse than that, Your Honor. What happened was that we terminated him because he did not report the mold. What he did, and the board decision, the National Labor Relations Board decision is in the record. And that's volume three of the excerpts, pages 370 to 378. Part of the problem with that is, I mean, the reason for firing is, I mean, it's always a hotly contested issue. And to suggest that a third party would have, I mean, maybe it was misleading. I don't know. But that seems hard to prove true or false. You know, we have litigation all the time about why someone was fired, and everyone has a different view of that. So I would disagree, Your Honor. But here's why, is they came across and flat out said, the union presented both in their phone script and in their letters and in their emails. They sent out this message that somehow we had terminated this individual because he had reported mold. And they knew why we had terminated him. Whether they agreed or disagreed with that reason, obviously, they disagreed, you know, but they knew why we had terminated this individual. And they directly and openly. How do we as a court judge that? I mean, we have defamation and defamation claims are hard enough to get into. I mean, first of all, the proof defamation is a tall order. We'll get into that in a little bit here. But how do we judge whether that's coercive or not? One side saying, I guess your point is that it was material fact and that should have just gone to the jury, even though there was a dispute about whether it was true or false and intentionally coercive. But I come back to supposing the union said, we think Mr. X was terminated for such and such a reason. And the reason that the company gave was just a cover up for their improper reason. You are saying that that is coercive. Yes, I've said, you know, your honor, it's one who's being coerced. What what is what is it that the company or anyone else is being forced to do against their will because that statement is made? So I would disagree that, you know, in the concept of coercion, my reading of precedent is that it's undermining their their free will. It's sort of however that happens and it can happen in different ways. South Michigan and Ameristar point to examples of harassment, and they're very clear to stake out that harassing it's sort of a term of art in this context. I don't mean that it's if I'm sorry, judgely, is your argument of harassment really staked on the alleged falsity as opposed to the frequency of contact? Yes, judgely. And we kind of. I'm not going to say got off on a tangent because it's the you know, it seems like the panel was asking are very, very important. And I was doing my best to answer those. But you're correct is that the that the scale, the volume, we've identified those in our reply brief, particularly with. But did anyone receive more than one communication? It seems like some received maybe four emails over a six month period. It is. So here's my question. Is it volume in terms of how many people it was like you could send it out to 600 people, but everybody receives one communication? That's a lot of volume. But as to each individual, it's not. Or you could send 600 emails to the one person. And I think you have very different course of effects there. So what is the maximum number of communications that any one individual received here? I don't think you could have a maximum number, your honor, and that's why this is a jury question. But what are you saying? The facts just aren't developed here. What are the facts in this case? How what is the maximum number of emails that you have evidence that were sent or communications, not just emails to any one individual? Well, relying upon the union record, your honor, which is all we have to go by. There were, my understanding is 154 emails were sent in to various tertiary parties who had no connection with the conference or the Hilton. That's that's that's that's not the question that Judge Nelson put to you. I'm sorry that I'm sorry for misunderstanding the question. The question is, as to any given individual, what is the maximum number that any individual received of these communications? Thank you. So the truth is, we don't know. And we don't know because the union did not keep adequate records. But you've got to you've got a duty to show a material fact here. And it seems to me that one of those is is how many communications were sent to an individual. It can't just be we don't know the answer. What does the evidence here show? If it doesn't show more than three or four to one individual over six months, which was my understanding of the record. Correct me if I'm wrong. That's a far different case than 154 emails to one individual. Got it. Well, we know we know at a minimum, there were four emails sent to nine people in four separate cycles. And those are the eight volunteer board members on the. And over what period of time was that? Ten months, your honor. OK, you're out of time, but I do want to we'll give you some time for rebuttal. And I wanted to ask one question on this, the 56D motion. Can you flesh this out? It looks like discovery had closed. You you may have had a subpoena out to Mr. Cruz, I think was his name before discovery closed. But you didn't take his deposition. And then you stood up before the court and said, well, we've asked you to rule on summary judgment motions, notwithstanding any pending discovery. I mean, if you hadn't have made that omission, I might be more inclined to say you have a case here. But why did you say go ahead and rule on summary judgment? It's pretty hard for you to come back and say, well, now the district court erred by not allowing us to take his deposition. So that was my colleague, Ms. Sade. And what she said was, you know, the court had asked, are we prepared to proceed on argument? And as I recall the record, and I'm paraphrasing her testimony was, we can proceed today, but we want to reserve the right to finish up deposing him. I think it's important to acknowledge, Your Honor, that the union had listed Mr. Cruz on their initial witness list. And they had said, you know, contact him through defense counsel. When we tried to contact him, they refused to provide service. We were never able to effectively serve him. Can you give me some record sites for that reserve? Because this is a, I'm actually, I have some sympathy to your argument here, but I'm confused as to how this came about and why you wouldn't have pushed. I don't know if you didn't think that you needed his deposition for purposes of summary judgment. I'm not sure what was going on here. I will, while Mr. Myers presents his argument, I will, I will present mine. I did with just five seconds. I wanted to say, Your Honor, that it's undisputed that the scope and the scale of the context here substantially interfered with both the VCS and with the state counsel for SHRM. That's in the record as well. That's cited with pinpoint citations in our reply brief and in our opening brief as well. I will get you that site, Judge Nelson. And when it's my time on rebuttal, thank you for the extra time here. I'll, I'll present that to you. Thank you, Your Honor. Okay. Thank you. Mr. Myers. Yes. Good morning. May it please the court, Your Honors. The, I first want to address some of the factual statements that were made in terms of what the record is and what communications were made. The, in fact, the union communicated all of its boycott communications were through email, through social media, through leafleting. We didn't get into the leafleting issue. And through letter writing, physical U.S. mail letter writing, and through telephone calls. Is, is your position that as long as it's an email or a verbal communication, it could never be coercion or harassment? It would, the numbers just don't matter? Well, that's a hypothetical because in this case, there were, as you state, a maximum of four emails to any particular audience. But I want to know what your position is. Cause this is sort of an undeveloped area of the law. And I mean, you know, there's a couple of different ways we could go with this. I mean, we could say like emails and communications are just protected by the first amendment. I mean, does it make it any less protected by the first amendment to contact someone, you know, a hundred times over a week versus four times over 10 months? Again, hypothetically, because those aren't our facts here. I would, our position would be this, email, when one looks at DiBartolo and one looks at the conduct that DiBartolo admonished that 8B4 is intended to regulate, sending out an email in the normal course will not implicate an 8B4 violation. That's not my question. My question is, can you take conduct or can you take protected speech and turn it into a course of effect by volume? Sure. I can see an example, for example, there used to be this thing called black faxing, where you would send a fax and you could engineer it such that it sended repeated faxes and tied up the fax machine in a way that I think it had to come and get regulated about these sort of fax spam kind of things. I can see an email. I wouldn't know how to engineer this, but some kind of email that interfered with the server because of the volume of emails coming in. So the annoyance in and of itself, your position sounds like the annoyance in and of itself is not coercion. But the annoyance from an email is, if anything, less than the annoyance from a telephone call, because it could be deleted instantaneously by anyone who's, oh, yeah, it's them again. It's that, you know, every person here in this courtroom probably gets a dozen a day of emails that they delete because they know they're spam or whatever. And that's right. And I think the important thing about annoyance, about 8B4, it's not to protect the psychic piece of the audience. I mean, it may be annoying to be spoken at about a labor dispute that you don't want to hear. But what 8B4 regulates is conduct and not just any conduct, a band of conduct. And I think that's what I was trying to suggest, is the emails you would have to show that it was somehow slowing up the Internet service you're receiving or. That's our position, Your Honor. Yeah, that you could send these out every day and that's your constitutional right, is to, you know, be so forceful with this that somebody might just, I don't want to get into this. I don't know what the truth is, but these guys seem persistent. So therefore, I'm just going to back out of the contract. Well, I certainly think. And again, I'm not suggesting that that's what happened. I understand we're talking hypotheticals, but I want to conceptually understand what the position is, because when I read the law on this, I mean, it does seem to give a lot of latitude. And it seems to be a little bit detached from what I think the common meaning of coercion or harassment would be. You're absolutely right. And the Supreme Court said that these terms on their face are quite broad and could mean anything. But this is where they came from. This is what Congress was intending to prohibit, a specific band of conduct, which is ambulatory picketing, or we can say conduct that is comparable and analogous to that. But it was not intended to prohibit speech. And the sending of an email, be it one email, be it a hundred emails, constitutes speech. I will say in terms of the annoyance things, that's why smarter people than I invented spam filters and junk filters and all that kind of thing. But anybody can ignore an email. And to the extent that it bears upon their mental process of, oh, gee, there's that labor dispute. Yeah, I actually am sympathetic to that cause. I don't want to hear this or I want to learn more about it. That's all the kind of communicative, expressive component of that communication. That 8B4 doesn't regulate. Counsel, can you address the emails and the conduct directed toward the board members, employers? That conduct was the one I found most troubling because it seems to bleed a little bit more into the coercive area because no one wants someone to contact their employer because the employer has control over the employee and you can get fired. So can you address that? Well, factually, there were three emails, I believe a total of three emails sent to certain employers of the board members of AK Alaska SHRM. So that so that's why the number here really matters. If you're sending directly to the board members, sure, you can delete it. An email going to your employer, whether it's one or two or five, it's still concerning to the employee when someone, a stranger contacts the employer and suggests the employee is doing something untoward. So there is some sense of coercion there. Well, let's look at that from a First Amendment point of view. Before you do that, I'm just not certain about the facts here. I don't think maybe I'm wrong that the emails we're talking about, the three emails said anything about the employee. Yes, they were sent to the employer, but they what they did is they laid out the reasons that the union had given throughout the campaign as to why the hotel should not be used or whatever. I don't think there was one word about the employee in any of those three emails. That's right. It was a standard email. It I don't want to misstate, I believe it was identical for all intents and purposes. There may have been a preamble or something that was added to that address. Can you answer Judge Lee's question about what the limits are? I think it's important to locate this within the First Amendment jurisprudence because our speech in the labor context can't operate under different First Amendment constraints as speech in any other context. We look at speech and it goes to Hilton's view that there's a distinction to be made between speech that is educative and enlightening versus speech that is harassing or that is coercive. That's not a distinction that the Supreme Court has recognized in the First Amendment context. Specifically with respect to coercive, look at Organization for a Better Austin versus Keefe, where the organization there was directing letters and leaflets to parishioners of the Target's church, to friends and neighbors, to persons who could exercise coercive social pressure upon that individual to change his what was blockbusting practices. And the Court of Appeals said, look, I don't really think you're trying to persuade him to sign an agreement. I think you're trying to coerce and ostracize him. And the Supreme Court said that that's a distinction without a difference for First Amendment purposes. Even though the speech is intended not necessarily to educate, to appeal to one's better angels and so forth, that the speech is intended to exert social pressure or ostracize doesn't remove it from the scope of the First Amendment. If it doesn't do that in other contexts, it can't do it in the context of a union advocating a boycott. We know that speech is protected, notwithstanding that it is designed to inflict enormous emotional stress. And from Snyder versus Phelps, the- He's supporting, you know, anti-union activity, and this is unconscionable. And you should look at whether this is the type of employee you want to have. Even if they'd said that, you'd say, hey, protected speech. In the phrases that you just characterized it, I would say it's protected speech. If we made some false claim of fact about that employee, I mean, we're very careful to make sure that we are making non-defamatory statements. No, but I mean, I'm very interested in what your position is, because I mean, I think Judge Lee's, I mean, we've got a factual issue we'll have to get into. But I think Judge Lee's question is apt, which is, I mean, again, at some point, this just has the feeling of being coercive. And your point is that's our First Amendment, right? We can, we can, as long as it's truthful, we can do whatever we can really do, whatever we want. I don't see how, I'd be interested in your views, how any reasonable reader could read any of these three emails as having anything to do with the employee. They don't say a word about the employee. They repeat the same virtually word for word position that the union had been leafleting and sending out by emails to, you know, dozens of people. It's just bringing to the attention of the persons who would ultimately have the responsibility for approving, going to this hotel, the facts that the union wants to make them aware of. That's absolutely right. And it's no different, I would submit, than what the Supreme Court specifically said in quoting from one of the Senate reports in the 1959 Landrum Griffin Act, that the union can publicize its dispute via the newspaper, via the radio. Obviously, this is dating the decision, but all manners of publicity. And so AP4 is not a general civil code of, of, you know, courteous and kind behavior. It is a particular statute that was, that prohibits the union from engaging in particular conduct. And there are other laws that may prevent the union from engaging in other conduct, defamation laws and whatever, extortion laws, any other kinds of laws out there that may get at different aspects of this. But in terms of what AP4 does, it prohibits a specific ill that Congress was intending to, to remedy. The, there's no dispute. There was no picketing conduct. There's no conduct even remotely like picketing to the extent that they've drawn attention to one of the leafletting events. Judge Kindred insightfully said, look, you're asking me to look at a photograph and make conclusions about that. And I'm not going to do that. Can you address this, the 50-60 motion? It does strike me. I mean, in the abstract that if you have a pending subpoena out before, do I have the facts right? There was a pending subpoena to Mr. Cruz out before the summary judgment motion was filed. I don't know how much effort had been made to enforce that subpoena, but it seems like in a normal world, you might, a district court judge might be inclined to allow that deposition to take place. Did, did, did, did we have the representation correct from opposing counsel that she said she wanted to reserve the right to depose? Well, the, the, or the record is in this, in volume two of the appendix, the, what she, and I don't want to misquote her here, but what she said was she saw no reason for the summary judgment motion to be resolved. And she reserved, if this case goes to trial, would then seek to depose, and so that presupposes. The interpretation seems to be, hey, we don't think we need it for summary judgment. We, maybe they were planning to hang on to their argument they're making now, which is even if it's admissible, if we can get admissible evidence, that should be enough to get past summary judgment. Would Mr. Cruz, I don't know if you can represent anything about this, what would his testimony be? Well, I can, I think there's more to it, and I submitted my own appendix with all of the briefing and the evidence, so you'd have to look through the supplemental appendix to, to find the correspondence about this. What happened was that the, the complaint had no specifics about the asserted false claims. I had to, I was looking at, I don't know, of all these phone calls, which one are you saying that we made falsely impersonated Dr. Lisa Pershing? I thought there was an amended complaint that sort of, at some point that, oh, so when did this statement from Mr. Cruz become apparent in the litigation? When I got some material and discovery, not from Hilton, but from VCS, because I was going to depose Ms. Strother, and I got at that time documents that made clear, and I'm, I hope I'm not misremembering, that made clear that the calls at issue were, were specific calls to the University of Georgia. At that point, I was able to go back and say, okay, who made the call to the University of Georgia? Carlos Cruz. I told Ms. Sade, it's Carlos Cruz, okay, and this was back in May of 2019, once we were finally getting going in discovery, and, and I disclosed the name. She waited until the, right, the very close of the initial discovery cutoff, which was going to be in, it was extended once, but in October, she said, I'm going to depose Carlos Cruz. And, and I said, I'm not going to accept service of process. I didn't represent, I was going to, I said, I can't and I won't, but here's his business address, make sure you're going to do it. At that point, we got into this, they wanted to question our, our Rule 30b-6 witness about all kinds of things outside of the scope. I had to go to court to get a motion, a protective order in that. And we agreed, I'm sorry, that to extend the discovery deadline till March. So now from October till March, she's got another six months to conduct discovery. She waits until the day before the end of discovery, or practically the week before. And served a subpoena at that point. To try to serve the subpoena. But that's not that unusual. I mean. Well, I, from an abuse of discretion standard. Well, I, fair enough, fair enough. That's why I'm kind of focused on the representation that was made. And it sounds like it might have, well, anyway. The representation, I never represented. Yep, I know, I know, you're the wrong person to ask. That I would accept service of subpoena. And it's not my job, I think, to serve their witnesses. But in the end of the day, what Judge Kindred, I think, bent over backwards to give them full opportunity to make their case. They hadn't served our Rule 30b-6 witnesses until practically the day before. No, look, I get it. I don't want to get into the whole thing. I know these have a long and storied history. I'm just trying to understand. And I take your point. Abuse of discretion is a high standard, so. The, I don't know if, I'm sure I'm approaching my 15 minutes. But there's the question of misleading speech that you had questions about. I don't know if that's something you. I think we understand the issues, and we've let you go over. So much appreciated for your argument today. Thank you, Your Honor. We'll give two minutes for rebuttal. Thank you, Your Honor. Sorry, I had a little elder moment trying to get configured here. I'll be as very brief as I can. The court has been generous this morning with the time, and I appreciate it. The transcript citation, Judge Nelson answering your question. It's a second volume of the excerpts of record, pages 46 to 47. And Ms. Sade's comments are from line 12 to 25, and the following page, line 1 to 3. As I interpret her comments, she clearly said that, and I'm quoting now. I mean, at this point, I see no reason not to go forward with today's hearing or to have the motion resolved, but I don't want to withdraw the request to depose Mr. Cruz. But that does seem to be a concession that we don't need this for summary judgment, we might need it for trial. And so then it kind of comes back to the same argument you've already made, which is, in your opinion, inadmissible evidence can survive summary judgment as long as it could become admissible later on. The panel will interpret her comments. What I would ask the court to do is to read all of her comments, and for time's sake, I was going to sort of glide over that. But as I interpret her comments, she's reserving, she doesn't want to abandon the right to depose Mr. Cruz. And to the question about abuse of discretion, the district court relied upon his deposition. And in its order, so it seems really incongruous to rely upon Mr. Cruz's deposition, deny us the opportunity to depose him, particularly under the circumstances when we were supposed to contact defense counsel, but defense counsel wouldn't make him available. And we couldn't find this witness who's not from Alaska, he's from somewhere in California. So there were a lot of factors there that I think would support the relief that we've sought and remand. We've identified all of the genuine issues of material fact. I did want to, and that's in our reply, particularly with pinpoint citations, all of the instances of harassing conduct that would be sufficiently severe to establish coercive behavior. Judge Lee identified a critical point, I believe, which is the contacts with the employers. It was not just the emails. Please look at the flyers too, because you'll see the flyers that were disseminated at all of these different employment places, the museum, and Denali Federal Credit Union, and the bank, North Rim Bank, and Nana Regional Corporation. All of these flyers targeted the individual volunteer board members, and all of them falsely said that the volunteer board members had refused to take action, had refused to cancel the conference. Well, they didn't have the authority to do so anyway. And all of the board members, and this is in the record, all of the board members testified that they felt threatened, that they were anxious, that they felt stressed, that this greatly concerned them, that they feared for their jobs. That's harassment too. That's at least a genuine issue of material fact that would send this case back and ought to be sent back. Harassment also, the phone calls, we didn't have a chance to talk with those. We've actually cited and quoted many of them in our reply. I think it's telling that they were calling people repeatedly. They say they didn't. Their own records show that they did. They were calling people repeatedly. And then when they were being told, don't call me, I'm at work, then they were calling right back again. And that's been likened, by the way, to a captive audience. When you're at work, you're not in a position to very easily refuse to answer a phone when you're at work, particularly in this context. I think it's very, very telling. And we've never talked at all about how did the targets, how did BCS, what did they say, and what did the State Council for Shrimps say? We've given you a lot more time, so if you can sum up. We do have your briefs, and we understand your arguments. So maybe it's time to go. I thank the court so much for this opportunity today. I believe in my client. My client worked hard and worked with these individuals. They've done the very best they could possibly do. I'd ask the court to look carefully at this case, recognizing the complicated and challenging issues. Please reverse. There are genuine issues of material fact. This case needs to be decided by a jury. Thank you very much for your time and attention this morning. Thank you, counsel. Thank you to both counsel for your arguments. And the case is now submitted.
judges: NELSON, LEE, Rakoff